St. Louis-San Francisco Railway Company *v.* Tidmore.

Opinion delivered February 15, 1932.

*E. T. Miller, E. L. Westbrooke, Jr.,* and *E. L. Westbrooke,* for appellant.

*W. B. Scott* and *A. B. Shafer,* for appellee.

Butler, J. The appellee, T. M. Tidmore, was a section foreman in the employ of the appellant on July 8, 1930, and on that date, shortly after one o'clock in the afternoon, while engaged in the performance of his duties, was injured. The appellee brought suit for damages because of his injuries, and recovered a verdict and judgment against the appellant from which is this appeal.

The principal ground urged for reversal, and one which we think is decisive, was that the evidence was not sufficient to sustain the verdict, and that the appellant's request for a directed verdict in its favor should have been granted. The testimony most favorable to the appellee tended to establish these facts. At about one o'clock, the switch engine passed by a point about 1,600 feet south of Highway No. 70 which crossed the main track of appellant practically at right angles. At this place he was directing two negroes in cutting small trees and bushes on the right-of-way west of the passing

track. The switch engine was travelling north, but its front part was directed toward the south, the engine being in reverse. Several cars were attached to this engine on the north or back end of it, and several at its front on the south. As it passed by appellee, the conductor, who was hanging on one of the cars, gave him a sign with his hand which appellee thought was a "highball," and supposed that it meant that the switch engine was passing out of the yards to go to a junction point called Presley about 2½ miles north. At this time there were two or three cars standing on the side track or passing track about 150 or 200 feet south of where the switch enters from the main track to the passing track just south of Highway No. 70. Further south and with an interval between them were other cars, near which the aforesaid work was being done.

Appellee watched the switch engine with its cars attached until it crossed the highway and went on to a team track which connected with the main line by a switch a short distance north of Highway No. 70. The main track ran north and south at this point, and the passing track, immediately west of which appellee was working, ran parallel with it. From time to time appellee looked from the west between the cars toward the north. After the switch engine passed to the north, the work of cutting the timber was continued, and in this operation a sapling or small tree was felled upon one of the coal cars. Appellee directed one of the negroes to get upon top of the coal car for the purpose of dislodging the tree, and, while the negro was on the coal car, appellee asked regarding the whereabouts of the switch engine, and was told that it was near the north end of the team track about a quarter and a half (⅜ of a mile) away. He continued to stand where he was, supposing he was in the clear and in safety when, about eight or ten minutes after the negro had descended from the coal car, the car by which appellee was standing was struck by reason of the switching operation of the cotton

cars from the main line to the passing track, and moved forward, a part of which projecting about four inches to the side, in which standards were fixed, struck the appellee on the shoulder violently knocking him to the ground and injuring him severely.

Appellee stated that it had generally been the practice of men operating the engine to give him a signal when they were going to switch cars upon a track on which he might be working, and that often he would ask the train crew what time they were going to use the track, but on this occasion he did not ask them, as he was not working on the track, but was clearing bushes on the right-of-way. The appellee was an experienced man, having worked on the section for fourteen years, ten years of which he had been foreman. He was well acquainted with the rule that required him to keep a lookout for his own safety and for the safety of the men working under him. It was his duty, when working around any track, to be on the lookout for cars which might be moving. He was working in the yards of the appellant in the city of West Memphis, and through these yards ran the main line from north to south. On the west of this main line and south of Highway No. 70 ran the passing track parallel with the main line. Just north of the highway a switch led from the main line to the team track, east of and parallel to the main track. The passing track was connected with the main line at a point near the depot a short distance south of Highway No. 70 by a switch and again by a switch at a point to the south of where appellee was working. To the right and opposite to where appellee was standing was a cotton compress, and between it and near to it was another track which was used in handling cotton either coming in or going out of the compress. This side track was connected with the main line at a point just south of Highway No. 70 by a switch a short distance north of the switch leading into the passing track. It was also connected with the main line at two points south of the place of appellee's injury. These tracks were used daily for switching purposes, the switch

engine and crew using them several times each day in these operations. On the forenoon of the day of the accident a number of cars had been switched on to the passing track, and the train crew had seen the appellee and his crew at work on the right-of-way cutting the bushes, and they knew that he was continuing this work after the noon hour. About one o'clock P. M. the switch engine entered on the track by the compress and there picked up three carloads of cotton for the purpose of moving them over to the passing track. To accomplish this, they moved down toward the south with the engine headed in that direction and pushing the cars ahead, with some attached to the rear, on to the main line, and backed north on that line past where the appellee was working, proceeding on in a northerly direction. It was necessary for them to pass entirely across Highway No. 70 in order to give clearance between the cars and the north switch so that it might be opened. From the point where that switch entered the main line to the point where the injury occurred there was a considerable down grade of perhaps four or five feet between the two points, and, when the switch engine with its cars attached passed the switch and the highway, it moved again south and shunted the three cars of cotton through the switch on to the main line. A brakeman was riding one of these cars, which were moving at this time at a rate of about four or five miles per hour—a sufficient speed on account of the down grade. No signal was given by the operatives of the switch engine that this movement would be made, and no effort was made by any of them to notify the appellee that the cars would be switched upon the side track. The weight of the cars rolling down grade was sufficient to put the first bunch of cars on the side or passing track south of the switch in movement, and they together with the three cars of cotton moved down, striking the cars near which the appellee was standing with force enough to move them forward, resulting in the accident to the appellee.

These are the essential facts disclosed by the testimony most favorable to the appellee which we think fail to disclose any negligence on the part of the crew of the switch engine, but show that the accident occurred by reason of appellee's own inattention in taking a position sufficiently near the track to be struck by a moving car, which position it was unnecessary for him to occupy in the performance of his duties.

It is argued by the appellee that the train crew was negligent in that the brakeman in charge of the cars being switched failed to put on the brakes when these cars passed upon the passing track, and that this is admitted by the testimony of the brakeman Garner who rode the cars, and also that the crew was guilty of negligence in failing to give a "side track signal." This could not be said to be negligence under any view of the case, since the undisputed testimony shows that the cars were moving at not more than four miles an hour, and no one was expecting workmen upon the track. An examination of the transcript, however, fails to bear out the contention of the appellee as to the purported testimony of the brakeman, Garner. He testified, both on direct and cross-examination, that in the switching operation he set the brakes on the cars being switched. It is true that he testified at one time as to one switching operation that he did not put on the brakes and further stated that he would not say whether or not he did, but there were two switching operations about which he was questioned, and, when the entire testimony of this witness is read, it is uncertain which one he was referring to. Whether he did or did not put on the brakes would be immaterial, as is disclosed in that part of the testimony of the appellee when he testified as to what the custom was with reference to the information being given him when the switching crew intended switching cars on to the side tracks. This would be done when they knew or had reason to believe that he was at work on the track, and appellee himself stated that when he was engaged in work on the tracks he would ask the operatives of their in-

tentions, but that on this occasion he did not because his men were working on the right-of-way and not on the tracks. This the train crew knew, and that appellee's duties did not require him to be upon the tracks or near enough to be within a point of danger, and they had no reason to expect that he would expose himself to unnecessary hazards, and therefore had reason to believe that the track was clear, and that the operation in which they were engaged would result in danger to no one, which was conducted in the customary way.

While acknowledging the duty of the appellee to keep a lookout for his own safety, it is insisted that his failure, if any, to keep the lookout was caused by a sign given him by the conductor in passing which he thought meant that they were through with their switching operations and were going on to the junction at the north. But, although he might have thought this, and even had he been justified in this supposition, he afterward knew by information conveyed to him by the negro on top the coal car that they had not gone on to the north, but were still in the yards on the team track. Within eight or ten minutes thereafter the cars had been pushed on to the passing track and the accident was occasioned by appellee's failure to observe the rule to keep a lookout for his own safety, and because he occupied a position of danger entirely unnecessary for the performance of his duties and one where there was no reason to believe he would be.

It is conceded that the work in which appellee was employed was interstate commerce, and that the Federal Employers' Liability Act is the law applicable to the facts here before us. In *Dallas Coal Co.* v. *Rotenberry,* 85 Ark. 237, 107 S. W. 997, the court said: ''The undisputed evidence establishes the fact that appellee went into the place of danger in violation of the rule provided for his protection. This was contributory negligence on his part, and precludes a recovery.''

In the case of *C., R. I. & P. Ry. Co.* v. *Abel,* 182 Ark. 631, 32 S. W. (2d) 1059, it was the duty of Abel to keep in repair and to operate the engine used for tamping ties

in the roadbed. The machine was not operating satisfactorily at the dinner hour, and Abel, during that period, engaged in the repair and adjustment of the engine, and, while so at work, he was struck by a passing train. The court, in holding that the facts in that case precluded a recovery, said:

"Appellee was an experienced workman; he knew the location of the machine to be repaired relative to the track and the embankment or side of the cut, that trains were frequently passing over the track, and that the rules required him to rely upon his own watchfulness and keep out of the way, proceeded with his work of making the repairs, leaving the engine running and the air pump working, both making a great deal of noise, without looking toward the direction of the approaching train, according to his own statement, which he could have seen for almost a half mile, and stepped back on the track between his machine and the track where the passing train struck and injured him. * * *

"According to the undisputed testimony, appellee's own statement of the occurrence of the injury, he neglected to take proper care for his own safety and assumed the risk incident upon the performance of the work without relying upon his own watchfulness to keep in the clear as the rules of the company required, and they were entitled to expect of their employees."

The judgment of the trial court is reversed, and, as the facts seem to have been fully developed, the cause is dismissed.